```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA


                                        MDL No. 1643

IN RE: EDUCATIONAL TESTING
       SERVICE PRAXIS                   SECTION: R(5)
       PRINCIPLES OF LEARNING
       AND TEACHING: GRADES
       7-12 LITIGATION                  JUDGE VANCE
                                        MAG. JUDGE CHASEZ
```

**THIS DOCUMENT RELATES TO THE FOLLOWING CASES: CIVIL ACTION NOS.**

**05-282, 05-2155, 06-6107, AND 06-11276.**


<u>ORDER AND REASONS</u>

The defendant, Educational Testing Service, moves to dismiss several of plaintiff's claims.  For the following reasons, the Court GRANTS defendant's motion in part and DENIES it in part.


**I.    FACTUAL BACKGROUND**

**A.    Educational Testing Service**

Defendant Educational Testing Service ("ETS") is a not-for-profit corporation organized under the laws of New York, with its

principal place of business in Princeton, New Jersey.  A major portion of ETS's business consists of designing, administering, and scoring a wide range of standardized educational tests.  ETS is the world's largest private educational testing organization, and it administers over 12 million examinations annually.

Among the educational tests that ETS designs, administers and scores are the Praxis Series examinations.  The Praxis tests are a series of tests used by many states in the teacher licensing process.  Nearly 80 percent of the states that include tests as a part of the teacher licensing process use one or more of the Praxis tests, and passage of some or all of the Praxis tests is required for licensing in 39 states and U.S. jurisdictions.  The Praxis tests are administered six times per year, at 650 test centers in all 50 states.

This case concerns only one of the Praxis series of tests – the Praxis Principles of Learning and Teaching: Grades 7-12 (the "PLT: 7-12") test.  The PLT: 7-12 consists of both multiple choice and short-answer "constructed response" questions and is designed to evaluate a beginning teacher's knowledge of a variety of material relevant to teaching students in grades seven through twelve.  During 2003-2004, 19 states contracted with ETS to use the PLT: 7-12 as part of their teacher licensing process.  The PLT: 7-12 is also relevant to colleges, universities and

2

professional organizations as a measure of teaching credentials.
Persons who take the PLT: 7-12 can request that ETS report their
scores directly to various states, colleges, and universities.

Prospective test-takers contract with ETS to take the PLT:
7-12 by completing a registration form and paying a registration
fee.  Plaintiffs allege that during 2003 and 2004, the deadline
for registering for the next administration of the PLT: 7-12
passed before the individuals who sat for the previous
administration of the test received their scores.  The result of
this practice was that test-takers who failed the test and wished
to retake it during the next test administration were forced to
pay a $40 late registration fee.  For example, a test-taker who
took the PLT: 7-12 on December 7, 2004 would be notified of his
or her score around February 8, 2005.  The next administration of
the PLT: 7-12 would be scheduled for March 5, 2005, but the
registration deadline for that exam would be February 1, 2005,
before those test-takers who sat for the December 2004
administration received their scores.  Test-takers who failed the
December 2004 administration of the exam and wished to retake it
in March 2005 would therefore miss the registration deadline and
would be permitted to register for the March 2005 test only if
they paid a $40 late registration fee.  In April 2004, ETS
instituted a policy that test-takers who timely registered for a

3

test before knowing the results of a previous test would receive
an automatic refund of the registration fee if they passed the
earlier test.  Even under this system, test-takers who wish to
avoid a late registration fee must provide ETS with additional
money up front to account for the possibility that they might
fail the exam.

Once ETS scores a test, it sends the score to the test-taker
and up to three institutions or agencies designated by the test-
taker and that ETS has determined are eligible to receive the
scores.  ETS does not set the passing score for the PLT: 7-12.
Rather, each eligible institution or agency sets its own passing
scores.  The score report sent to a designated institution
includes the test-taker's current score, the highest score the
test-taker earned on each test taken over the past ten years, and
the passing score information for that particular institution.
ETS does not provide the test-taker or any of the test-taker's
designated institutions with a copy of the test book or the test-
taker's answer sheet.

If a test-taker feels that his or her score has been
reported incorrectly, ETS also offers a "score verification
service," which allows the test-taker to request that ETS verify
that the score received was accurate and consistent with the
scoring rules for that exam.  ETS charges between $40 and $80 for

4

its score verification service.

Test-takers who fail the PLT: 7-12 and wish to retake the test can sign up for ETS's "Diagnostic Preparation Program."  The Diagnostic Preparation Program is designed to provide test-takers with detailed, customized, state-specific feedback about their test performance.  Test-takers who sign up for the Diagnostic Preparation Program receive a Diagnostic Feedback Report designed to help them understand their performance on the test, identify their so-called problem areas, and create a study plan to target those areas the next time they take the test.  ETS charges between $75 and $175 for the Diagnostic Preparation Program, depending on whether the test is multiple choice, constructed response, or both.  ETS does not disclose the test-taker's test book or answer sheets as part of the Diagnostic Preparation Program, nor does it provide any information that reveals the content of the test that was taken.

**B.    The PLT: 7-12 Scoring Error**

Over the course of nine test administrations between January 2003 and April 2004, ETS incorrectly scored the PLT: 7-12. Specifically, when scoring the tests from those nine administrations of the PLT: 7-12, ETS graded the constructive response portion of the exams more stringently than it should have graded them.  As a result of this error, each of the

5

approximately 27,000 people who took the PLT: 7-12 during that time period received a score that was lower than it would have been had the exams been properly graded.  The scoring error caused at least 4,100 test-takers to receive a "false failure," *i.e.*, they were notified that they had received a failing score in at least one state in which their score was reported when in fact they should have received a passing score.  Although the scoring error affected the reported scores of all of the individuals who took the PLT: 7-12 during that time period, for the remaining 23,000 test-takers, it did not affect whether they received a passing score in the state or states to which their scores were sent.

After a client state questioned ETS about the scoring results for the PLT: 7-12, ETS began an investigation that ultimately led it to discover the scoring error.  On or about July 10, 2004, ETS began to notify affected test-takers by telephone and letter that ETS incorrectly told them that they had failed the PLT: 7-12 test when, after rescoring, they had actually passed the test.  ETS sent a letter to affected test-takers that read, in pertinent part:

> I am writing to inform you that ETS has re-scored your Principles of Teaching and Learning: 7-12 test and that you have achieved a passing score in one or more of the states that you designated as a score

6

>           recipient. . . .  A copy of your corrected
>           score report is enclosed, and, we will soon
>           mail your revised report to the states you
>           requested.  If you took the PLT: 7-12 test
>           multiple times between January 2003 and April
>           2004, then your scores for each test have
>           been re-scored and corrected reports are
>           enclosed for any tests when your passing
>           status changed.

(AMC ¶ 29).  Although ETS re-scored the tests of those test-
takers who had been told incorrectly that they failed the exam in
each of the states to which they had they their score reported,
ETS did not re-score the tests of those test-takers whose
initially-reported score was sufficient to pass the exam in at
least one of the states to which it was reported.

     Plaintiffs allege that ETS's scoring error prevented many
test-takers who received a false failing score from receiving or
from timely receiving their teaching credentials and therefore
prevented them from retaining or obtaining employment as
certified teachers.  The scoring error also allegedly delayed
some of those test-takers' completion of bachelor's and/or
master's degrees, and it caused some test-takers to abandon
teaching and pursue alternate majors and careers.  Many of those
test-takers also retook the PLT: 7-12 and in the process incurred
additional registration fees and test preparation expenses.
Further, some test-takers who initially received a passing score
in each of the jurisdictions to which their score was reported

were allegedly harmed by having artificially low scores reported to states and institutions.

## II.  PROCEDURAL HISTORY

On December 16, 2004, the Judicial Panel on Multidistrict Litigation transferred 13 actions pending in federal district courts in Pennsylvania, Louisiana and Ohio to this Court under 28 U.S.C. § 1407 for consolidated or coordinated pretrial proceedings.  On January 4, 2005, the Court consolidated those actions for pretrial purposes.  On January 24, 2005, the Court appointed lead and liaison counsel for plaintiffs and directed plaintiffs to file a master complaint by March 10, 2005. Plaintiffs filed the master complaint on March 10, and, on April 13, 2005, the Court issued an order stating that all causes of action in consolidated cases that were filed in or transferred to this Court before January 20, 2005 that were not included in the master complaint would be dismissed with prejudice if counsel in those cases did not move to segregate those causes of action with 30 days.[1]

_____

[1]The Court had previously issued an order on March 4, 2005, stating that all cases transferred to this Court after January 20, 2005 would be bound by the master complaint unless counsel in those actions moved to segregate their case from the master complaint.

8

On April 11, 2005, ETS moved to dismiss a number of the claims asserted in the master complaint. Specifically, ETS moved to dismiss plaintiffs' state law claims for negligence and negligent misrepresentation, as well as plaintiffs' requests for emotional distress and punitive damages on their contract and tort claims. ETS also moved to dismiss plaintiffs' claims under the Sherman Act. The parties briefed the motion, and oral argument was held on June 2, 2005. At oral argument, the Court directed further briefing from the parties on choice-of-law issues. That briefing was completed on July 26, 2005.

On December 1, 2005, the Court granted ETS's motion for partial dismissal as to the Sherman Act claim. While ETS's other motions to dismiss remained pending, the parties notified the Court that they had reached a tentative settlement. On February 10, 2006, plaintiffs moved for preliminary approval of the settlement and for certification of a class for the purpose of settlement. The Court held a hearing on the motions on February 22, 2006. On March 13, 2006, the Court certified a settlement class, appointed class counsel, and preliminarily approved the proposed settlement. The Court at that time appointed a Special Master and Court-Appointed Disbursing Agent, and approved the proposed notice and claim forms. The Court also approved deadlines of June 3, 2006, for exclusions (or opt-outs), and July

9

3, 2006, for objections to the settlement.  Finally, the Court scheduled a fairness hearing on the settlement for July 12, 2006. The plaintiffs in the above-referenced cases, Melissa Wilthew, Brooks Pursley, Zachary Wallick, and Christin Martin, filed valid exclusions before the deadline and therefore were not included in the settlement class.  ETS now re-urges its motion to dismiss as to the negligence and negligent misrepresentation claims of these plaintiffs, three of whom sued in Ohio,[2] and one of whom sued in Pennsylvania.

## III. LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff.  *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991).  The Court must resolve doubts as to the sufficiency of the claim in plaintiff's favor.  *Vulcan Materials Company v. City of Tehuacana*, 238 F.3d

---

[2] Defendant also suggests that one plaintiff, Zachary Wallick, should not be entitled to state a claim under the Ohio Consumer Sales Practices Act (OCSPA).  Because Wallick has not asserted such a claim, but only has indicated that he intends to in the future, dismissal of that claim would be premature at this time.

10

382, 387 (5th Cir. 2001).  The claim should be dismissed only if it appears that the plaintiff cannot prove any set of facts in support of her claim that would entitle her to relief.  *Id.*; *Pitotrowsji v City of Houston*, 51 F.3d 512, 514 (5th Cir. 1995).

## IV.  THRESHOLD CHOICE OF LAW

Plaintiffs' actions that are currently consolidated before this Court for pretrial proceedings originated in district courts in Ohio and Pennsylvania.  The Court must first determine which states' laws should be applied to determine the sufficiency of the state law claims asserted in the master complaint.

In a multidistrict litigation involving cases transferred pursuant to 28 U.S.C. § 1407, the Court must apply the choice of law rules of the transferor court.  *See In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 21 F. Supp. 2d 593, 597 (E.D. La. 1998) ("In this multi-district litigation, the Court is obliged to apply the law that would be applied by the transferor court.").  Because the cases at issue were transferred to this Court from federal courts in Ohio and Pennsylvania, the Court must analyze the choice of law rules of each of the transferor courts – *i.e.*, the choice of law rules of each of the states in which the transferor courts sit.  *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003)

(citation omitted).

The parties agree, generally, on which states' laws apply to the issues raised by ETS's motion to dismiss, but they have disputes on several discrete choice-of-law issues.  The Court conducts its choice-of-law analysis under the headings of the applicable sections.

## V.  DISCUSSION

### A.  Negligence claims

#### 1.   Applicable Law

As to the their negligence claims, Wallick and Wilthew do not contest ETS's assertion that Ohio law applies.  (Def. Supp. Choice of Law Mem. at 16-17, 20).  Further, Pursley's complaint evidences that his only contacts are with Ohio; thus, the analysis is the same for Pursley as for Wallick and Wilthew.

As to Martin's negligence claim, the Pennsylvania Supreme Court abandoned the state's then-governing conflict rule for tort cases, the *lex loci delicti* rule, in favor of "a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court."  *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964).  The approach adopted by the Pennsylvania courts has been characterized as a "hybrid" approach that combines elements of

the Restatement (Second) of Conflict of Laws approach with elements of governmental interest analysis. *See Budget Rent-A-Car Sys., Inc. v. Chappell*, 304 F. Supp. 2d 639, 644 (E.D. Pa. 2004). The goal of the Pennsylvania conflicts analysis is ultimately to apply the law of the jurisdiction with the most significant interest with respect to the issue in question. *See Griffith*, 203 A.2d at 806.

Pennsylvania's choice-of-law rules require the Court to first undertake an analysis of the parties' interests to determine whether a false conflict exists. *See LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996). A false conflict exists when the interests of only one state would be impaired by the application of another state's law. *Id.* If the Court finds a false conflict, then the Court should apply the law of the interested state. *Budget Rent-A-Car Sys., Inc.*, 304 F. Supp. 2d at 644. If a true conflict exists, *i.e.*, there is more than one interested state, then the Court must determine which state has a greater interest in having its law applied by weighing each state's contacts with the dispute as they relate to the relevant policies and interests. *See LeJeune*, 85 F.3d at 1072.

The Court concludes that both Pennsylvania and New Jersey have an interest in having their laws applied to the case filed in Pennsylvania. New Jersey, where ETS has its principal place

13

of business and where the scoring and equating of the PLT: 7-12 occurred, has an interest in applying its law to conduct that occurs within its borders.  Pennsylvania was Martin's state of residence.  Martin sat for the exam in Pennsylvania, had her score reported in Pennsylvania, and sought certification in Pennsylvania. (*See* Martin Compl.).  Accordingly, Pennsylvania has a strong interest in applying its laws to determine the claims and remedies available to a Pennsylvania resident who was harmed in Pennsylvania after taking an exam in pursuit of certification as a Pennsylvania teacher.  This interest is stronger than New Jersey's interest in the matter (which is somewhat attenuated because Martin's harm occurred outside of New Jersey).  The Court will therefore apply Pennsylvania law to determine whether Martin can state a claim for negligence against ETS.[3]

     2.   Analysis

     ETS moves to dismiss plaintiffs' negligence claims under Ohio and Pennsylvania law.  ETS argues that plaintiffs cannot

---

[3]Likewise, Pennsylvania law, as the law of Martin's residence, would apply under the principles of section 145 of the Restatement (Second) of Conflict of Laws.  *See supra; Budget Rent-A-Car Sys., Inc.*, 304 F. Supp. 2d at 645 n.10 (stating that Pennsylvania courts will apply factors of section 145 to determine which state has the most significant relationship to an issue).

14

state a cause of action for negligence because the economic loss
rule bars claims for negligence in this type of case and because
ETS owed no independent, non-contractual duty to plaintiffs.
Plaintiffs assert that the economic loss rule does not bar
negligence claims arising out of contracts of adhesion, claims
involving contracts for the performance of services, or claims
for negligent performance of a contract.  Plaintiffs also assert
that they have alleged numerous non-contractual duties that were
breached by ETS.

> a.   *The Economic Loss Rule*

The economic loss rule, in the most general sense, prohibits
plaintiffs from recovering in negligence and strict liability
actions for strictly economic losses, as opposed to personal
injuries or injuries to property.  One of the seminal
applications of the economic loss rule was the United States
Supreme Court's decision in *East River Steamship Corp. v.
Transamerica Delaval, Inc.,* 476 U.S. 858 (1986).  In *East River*,
the Court, sitting in admiralty, held that a commercial purchaser
of turbines for installation in oil tankers could not recover
against the manufacturer in tort for product defects that caused
damage only to the turbines themselves.  *Id.* at 873-75.  In so
holding, the Court found that a defect that causes damage only to

15

the product itself is a pure economic loss, essentially equivalent to a purchaser's failing to receive the benefit of his bargain, for which contract and warranty law, not tort law, provided the appropriate remedy. *Id.* at 870.  Because these claims fit within the rubric of traditional contract and warranty law, "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871.

Since *East River*, courts in Ohio and Pennsylvania have adopted the economic loss rule and have barred negligence and strict liability claims for damages suffered to a product itself. *See, e.g.*, *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 635 (Ohio 1989) ("[W]e hold that a commercial buyer seeking recovery from the seller for economic losses resulting from damages to the defective product itself . . . may not recover for economic losses premised on tort theories of strict liability or negligence."); *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 288 (Pa. 2005) (discussing scope of economic loss doctrine).

Courts in some jurisdictions have extended the economic loss rule beyond product actions and have applied the rule as a general bar to negligence claims for economic loss, including in contracts for the provision of services.  *See, e.g., Yauch v.*

16

*Southern Pacific Transportation Co.*, 198 Ariz. 394 (2000); *Maine Rubber Int'l v. Environmental Management Group, Inc.*, 298 F.Supp.2d 133 (D. Me. 2004). ETS has not pointed to any authority establishing that the courts of Ohio would extend the economic loss rule to service contracts such as the one at issue. Although the Court notes that some courts have applied Pennsylvania law to find that the economic loss doctrine applies to service contracts, *see Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482, 491 (E.D. Pa. 2003); *Factory Mkt., Inc. v. Schuller Intern., Inc.*, 987 F. Supp. 387, 396-97 (E.D. Pa. 1997) (predicting that Pennsylvania Supreme Court would apply economic loss doctrine to contract for services), the Third Circuit has stated that the economic loss doctrine "does not quite fit" outside of the context of products actions "because that doctrine developed in the context of courts' precluding products liability tort actions in cases where one party contracts for a product from another party and the product malfunctions, injuring only the product itself." *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 n.11 (3d Cir. 2001); *Taylor v. Creditel Corp.*, No. Civ.A. 04-CV-2702, 2004 WL 2884208, at *7 n.8 (E.D. Pa. Dec. 13, 2004) (same). This Court agrees with the Third Circuit's reasoning, and finds that the Pennsylvania Supreme Court would apply the "gist of the

17

action" doctrine, discussed *infra*, rather than the economic loss
rule to a claim for negligent performance of a contract for
services.  Thus, the Court finds that the economic loss rule does
not apply to plaintiffs' tort claims.

Even when the economic loss rule itself is not applicable,
it is black letter law that a plaintiff cannot recover for
negligence unless he or she establishes that the defendant
violated some duty imposed by law.  *See, e.g.*, *Textron Fin. Corp.
v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1271 (Ohio Ct. App.
1996); *Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d
10, 14, 19-21 (Pa. Super. 2002). Accordingly, as ETS correctly
argues, plaintiffs may pursue negligence claims against ETS under
the laws of the relevant states only if ETS breached an
independent legal duty to plaintiffs.

> b.   *Independent Duty*

Plaintiffs point to a litany of duties that ETS allegedly
breached by incorrectly scoring the PLT: 7-12.  Plaintiffs assert
that ETS breached legal duties to (i) properly score the PLT: 7-
12; (ii) hire competent persons to grade the PLT: 7-12; (iii)
properly train its employees to correctly score the PLT: 7-12;
(iv) conduct an item analysis against other test questions and
prior tests to discover potential scoring errors; (v) identify

18

all persons affected by the scoring error; (vi) re-score the examinations correctly upon re-scoring requests and payments by plaintiffs; (vii) timely notify plaintiffs and other score recipients of the scoring error; (viii) timely implement effective quality control procedures to determine the accuracy of scores; (ix) timely recognize that lower scores were due to scoring errors; and (x) implement appropriate procedures to prevent scoring errors.  (AMC ¶ 79).

Although plaintiffs are correct that a contractual relationship can give rise to independent legal duties, none of the duties that plaintiffs claim was breached is, in fact, an independent duty imposed by law.  Instead, the duties cited are simply restatements of ETS's broad contractual duty to correctly score the PLT: 7-12 (alleged duties (i)-(iv), (vi), and (viii)-(x)) and to correctly report the test-takers' scores (alleged duties (v) and (vii)).  Thus, none of these duties can support plaintiffs' negligence claims.

Plaintiffs also assert that ETS breached duties imposed by the No Child Left Behind Act, which requires states to report to the federal government "the percentage of teaching candidates who passed each of the assessments used by the State for teacher certification and licensure, and the passing score on each assessment . . . ."  20 U.S.C. § 1027(b)(4).  Plaintiffs argue

19

that ETS owed a duty to the public to report scores accurately so that the states could comply with the requirements of section 1027(b)(4).  Even if ETS owed this duty to the departments of education in Ohio or Pennsylvania, or to the general public, the plaintiffs have not demonstrated that ETS's breach of this duty to a third-party gives plaintiffs a claim in negligence in Ohio or Pennsylvania.

As plaintiffs have not identified any duty breached by ETS that is independent of its contractual obligations, plaintiffs' negligence claims must fail unless they fall under an exception to the independent duty rule.  Plaintiffs assert that there are three such exceptions that apply here: (i) claims involving contracts of adhesion; (ii) claims involving contracts for the provision of services; and (iii) actions for negligent performance, as opposed to nonperformance, of contractual obligations.

### c.   Contracts of Adhesion

Plaintiffs argue that their negligence claims are not barred because Ohio and Pennsylvania do not bar tort claims between contracting parties when the parties' contract is a contract of

20

adhesion.[4]  Plaintiffs have not, however, directed the Court to any authority indicating that Ohio or Pennsylvania would permit negligence claims for breaches of contracts of adhesion.  Neither of the two New York cases that plaintiffs cite, *Dalton v. Educational Testing Service of Princeton, New Jersey*, 588 N.Y.S.2d 741 (N.Y. Sup. Ct. 1992), and *K.D. v. Educational Testing Service*, 386 N.Y.S.2d 747 (N.Y. Sup. Ct. 1976), authorized negligence claims on the ground that plaintiffs did not have the opportunity to bargain freely over the terms of the contracts they had entered.  In *Dalton*, the issue was simply whether ETS had breached its contract with plaintiff, not whether plaintiff could bring claims in tort or even whether the contract, as a contract of adhesion, was unenforceable.  *See Dalton*, 588 N.Y.S.2d at 746 ("In this action Brian Dalton does not seek to avoid the terms of the contract, merely to enforce them.").

*K.D.* is equally inapposite.  In that case, the court held that ETS's contract with plaintiff, though a contract of adhesion, was enforceable according to its terms.  *See K.D.*, 386

---

[4]Plaintiffs frame this argument as involving an exception to the economic loss rule.  As explained above, however, the economic loss rule is not applicable to plaintiffs' claims.  The Court will nonetheless analyze plaintiffs' arguments in the context of the independent duty rule.

N.Y.S.2d at 752.  The *K.D.* court did note in passing that, when dealing with contracts of adhesion, "effort will frequently be made to protect the weaker party from the agreement's harsher terms by a variety of pretexts," and stated that a court "may hold that although the offending clause prohibits a recovery by plaintiff [e]x contractu, it does not prohibit a recovery in tort."  *Id.*  That *dictum* is of no benefit to plaintiffs here, as plaintiffs have not identified any provision of their contract with ETS that is so oppressive as to warrant judicial intervention.  The reason for courts' historical concern with adhesion contracts is to prevent overreaching – that is, to prevent weaker parties from being held to unconscionable contract terms that they had no opportunity or bargaining power to avoid. *See id.*  Here, plaintiffs have pointed to no term in their contracts with ETS that would, for example, prevent them from recovering any of the remedies afforded to them under general principles of contract law or that is otherwise unconscionable. Plaintiffs have failed to identify anything about their contracts that justifies a departure from the regime of contract law. Accordingly, plaintiffs' argument that parties to adhesion contracts should be permitted to maintain negligence claims fails.

    *d.   Negligent Performance of Contracts/Service*
           *Contracts*

Plaintiffs' remaining two arguments are that the relevant states' laws permit negligence actions between contracting parties when the alleged negligence consists of a breach of a service contract and when the claim is one for negligent performance, or misfeasance, of a contractual obligation, as opposed to nonperformance, or nonfeasance.  These arguments overlap substantially.  For example, a claim for negligent performance of a service contract is by definition a claim for misfeasance.  To avoid undue repetition, the Court will consider these two arguments together under each of the relevant states' laws.

              i.   Ohio

Under Ohio law, the general rule is that a breach of contract will not give rise to an independent tort claim unless the defendant has also breached "a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996).  Absent the breach of an identified non-contractual duty, a plaintiff cannot maintain a cause of action for negligence under Ohio law based on the same

23

conduct that amounts to a breach of contract. *See Sekerak v. Nat. City Bank*, 342 F. Supp. 2d 701, 715 (N.D. Ohio 2004) (no negligence claim for breach of services contract; "[T]here was no independent duty of care owed by [defendant] to plaintiff; therefore, there can be no independent cause of action sounding in negligence.").

There is language in some Ohio cases that "'[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract.'" *Mead Corp. v. ABB Power Generation*, 319 F.3d 790, 795 (6th Cir. 2003) (quoting *Hunsicker v. Buckeye Union Cas. Co.*, 118 N.E.2d 922, 924 (Ohio 1953)); *Berger v. Am. Bldg. Inspection, Inc.*, No. 96-L-114, 1997 WL 269318, at *4 (Ohio Ct. App. May 2, 1997) ("The mere fact that a breach of contract is alleged does not preclude a cause of action for negligence based on a duty assumed under the contract."). The Court finds, however, that this is not an accurate statement of Ohio law. First, the *Mead* court did not deal squarely with the breach of contract/negligence distinction. In *Mead*, the plaintiff asserted a breach of contract claim in lieu of a claim for breach of an express contractual warranty because the warranty had expired. The Sixth Circuit permitted

24

the claim because, although the parties' contract contained an express warranty provision, that provision did not purport to provide the exclusive remedy under the contract.  *See Mead*, 319 F.3d at 796.

Second, and more importantly, the reasoning of *Mead* is foreclosed by a 2001 Ohio Supreme Court case, *Kishmarton v. William Bailey Constr., Inc.*, 754 N.E.2d 785, 787 (Ohio 2001). In *Kishmarton*, the Ohio Supreme Court addressed the question of whether, when there is a contract between a homeowner and a builder for the future construction of a residence, the homeowner's cause of action against the builder for breach of the duty to construct the house in a workmanlike manner arises in contract or in tort.  *See id.* at 786.  The court held that the action sounded only in contract.  *Id.* at 787.  In its discussion, the Court emphasized that the builder's duties were imposed by contract, and not by operation of law:

> In this case, "the consideration is the services . . . [to] be performed by the contractor. . . .  While the contractor is still required to perform the services in a workmanlike manner, the quality of the product will be governed by the language of the contract itself."
>
> The contract governs the warranty of good workmanship; therefore, the warranty of good workmanship arises from the contract.  It can hardly be otherwise.

25

*Id.* at 787 (internal citation omitted) (alterations in original).

Under the reasoning of *Kishmarton*, Ohio courts would not permit the Ohio plaintiffs to maintain negligence claims against ETS because, as discussed above, plaintiffs have not identified any duty owed by ETS independent of the parties' contract. Thus, the Ohio plaintiffs' negligence claims are dismissed.

ii.   Pennsylvania

Pennsylvania courts apply the "gist of the action" doctrine to determine whether an action properly sounds in tort or contract.  The gist of the action doctrine is "designed to maintain the conceptual distinction between breach of contract and tort claims," *see Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002), and prohibits plaintiffs from maintaining tort actions based on facts that amount to a breach of contract unless "the wrong ascribed to defendant . . . is the gist of the action, the contract being collateral." *Id.* (quoting *Bash v. Bell Tel. Co. of Pa.*, 601 A.2d 825, 829 (Pa. Super. 1992)).  Although the Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine, this Court joins the many other courts that have predicted that the Pennsylvania Supreme Court would adopt the rule.  *See, e.g.*, *Etoll, Inc.*, 811 A.2d at 16-19 (collecting cases); *see also Factory Mkt., Inc. v. Shuller Int'l Inc.*, 987 F. Supp. 387, 394

26

(E.D. Pa. 1998) ("[T]his Court finds that the Supreme Court of Pennsylvania would adopt the 'gist of action' test to determine whether a cause of action can sound in tort or breach of contract.").

Martin's negligence claims are clearly barred by the gist of the action doctrine.  As discussed above, the breach of contract and negligence claims are based on precisely the same conduct. Each alleged breach of a tort duty by ETS is in fact subsumed within a claim for breach of contract.  Thus, the Court finds that the contract, which forms the sole basis for the parties' relationship, is not merely collateral to the alleged tortious behavior.  Martin's negligence claims are therefore barred.  *See Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. 2003) (tort claims barred by gist of the action doctrine when they were "inextricably intertwined" with plaintiffs' contract claims); *Etoll, Inc.*, 811 A.2d at 20-21 (gist of the action doctrine barred fraud claims when acts of fraud "arose in the course of the parties' contractual relationship" and duties allegedly breached "were created and grounded in the parties' contract").

Relying on a number of earlier Pennsylvania cases, plaintiffs assert that the test under Pennsylvania law is whether the alleged breach of contract is based on the failure to

27

perform, *i.e.*, nonfeasance, or negligent performance, *i.e.*, misfeasance.  If the alleged breach is one of misfeasance, plaintiffs argue, Pennsylvania courts will permit an action in either contract or tort.  *See Raab v. Keystone Ins. Co.*, 412 A.2d 638, 639 (Pa. Super. 1979).  The nonfeasance/misfeasance distinction has, however, been rejected in favor of the gist of the action doctrine by Pennsylvania appellate courts for over a decade.  *See, e.g.*, *Ingersoll-Rand Equip. Corp. v. Transp. Ins. Co.*, 963 F. Supp. 452, 454 (E.D. Pa. 1997) ("*Raab*'s approach . . . has been expressly rejected by the Superior Court in favor of one which looks to the essence of the cause of action asserted . . . .").

Finally, although Pennnsylvania courts recognize claims for negligent performance of contracts for certain professional services as an exception to the gist of the action doctrine, *see Rapidigm Inc. v. ATM Mgmt. Servs., LLC*, 63 Pa. D. & C.4th 234, 240-41 (Pa. Ct. Com. Pl. July 10, 2003), the services provided to plaintiffs by ETS do not fall within the scope of the exception. As the *Rapidigm* court explained, the exception for professional service contracts applies to professionals who "are not guaranteeing a result that can be described in a contract," but instead are "agreeing to exercise skill and knowledge normally possessed by members of the profession in an effort to achieve

28

goals for the clients that cannot be guaranteed." *Id.* at 243. Here, plaintiffs' contracts with ETS were not defined in such qualitative terms.  Plaintiffs contracted with ETS to administer a standardized test, to grade that test correctly, and to correctly report their scores.  Thus, plaintiffs' claims do not fall under the exception for professional negligence actions, and the Pennsylvania plaintiffs cannot maintain negligence claims against ETS.

### B.   Negligent Misrepresentation Claims

ETS moves to dismiss plaintiffs' negligent misrepresentation claims on the same ground as it moves to dismiss their negligence claims – that plaintiffs have not identified a non-contractual duty breached by ETS.  The Court first considers the applicable law, which requires revisiting the question of choice-of-law.

### 1.   Applicable Law

### a.   *The Restatement (Second) of Conflict of Laws § 148*

The Restatement (Second) of Conflict of Laws provides a special choice-of-law rule for negligent misrepresentation claims.  *See* Restatement (Second) of Conflict of Laws § 148. Under section 148, when, as here, the challenged representations were "made" in one state (New Jersey) and received in another state (the plaintiffs' states of residence), the court is to

29

apply the law of the state with the most significant relationship to the issue, with particular consideration of the following factors:

> (a) the place, or places where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Id.* If two or more of these factors, apart from defendant's state of incorporation or place of business, are located within a single state, that state's law will generally apply. *Id.* § 148 cmt. j.

Although section 148 has not been expressly adopted by the highest courts of Ohio and Pennsylvania, lower state courts and federal district courts in those states have applied section 148 in some cases. *See Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 951-52 (S.D. Ohio 2002); *Carder Buick-Olds Co. v. Reynolds & Reynolds, Inc.*, 775 N.E.2d 531, 543-44 (Ohio Ct. App. 2002); *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482, 505-07 (E.D. Pa. 2003).

30

Here, each plaintiff ostensibly received his or her score report, either by mail or by accessing ETS's website, in his or her state of residence.  These two factors alone – the plaintiff's state of residence and the place where the representation was received - are sufficient to require the application of the law of the plaintiffs' states of residence. In addition, each of the plaintiffs relied upon ETS's representations in his or her state of residence by applying for certification as a teacher in that state.  No other state, including New Jersey, ETS's principal place of business and the state from which ETS made the representations, has a more significant relationship under the relevant factors.  Thus, section 148 directs the Court to apply the law of each plaintiff's state of residence to plaintiffs' negligent misrepresentation claims.

> 2.   *Analysis*
>
> a.   *Pennsylvania - The Restatement (Second) of Torts §*
>      *552*

Pennsylvania has adopted section 552 of the Restatement (Second) of Torts to govern claims for negligent misrepresentation.  *See, e.g., Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 287 (Pa. 2005) (applying and

31

formally adopting section 552 as the law of negligent
misrepresentation, as well as extending the reach of the law to
architects and design professionals).  Section 552 provides, in
pertinent part:

> (1) One who, in the course of his business,
> profession or employment, on in any other
> transaction in which he has a pecuniary
> interest, supplies false information for the
> guidance of others in their business
> transactions, is subject to liability for
> pecuniary loss caused to them by their
> justifiable reliance upon the information, if
> he fails to exercise reasonable care or
> competence in obtaining or communicating the
> information.
>
> . . . .
>
> [T]he liability stated in Subsection (1) is
> limited to loss suffered (a) by the person or
> one of a limited group of persons for whose
> benefit and guidance he intends to supply the
> information or knows that the recipient
> intends to supply it; and (b) through
> reliance upon it in a transaction that he
> intends the information to influence or knows
> that the recipient so intends or in a
> substantially similar transaction.

Restatement (Second) of Torts § 552 (1977).

ETS argues that plaintiffs' negligent misrepresentation
claims fail for the same reason that their negligence claims fail
– that is, because plaintiffs have not identified a duty owed by
ETS that is independent and distinct from its contractual
obligations.  (*See* ETS Mem. at 16-20).  But ETS's argument fails

to acknowledge that Pennsylvania courts recognize a duty to provide accurate information when the elements of negligent misrepresentation under section 552 are satisfied.  As the Pennsylvania Supreme Court has noted, "[s]ection 552 *sets forth the parameters of a duty owed* when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities." *Bilt-Rite Contractors, Inc.*, 866 A.2d at 285-86 (emphasis added).

Further, ETS's reliance upon *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 620 (3d Cir. 1995) (applying Pennsylvania law), for the proposition that a claim for negligent misrepresentation cannot be stated by parties in privity, is misplaced.  Nothing in section 552 itself limits the availability of a cause of action for negligent misrepresentation to situations in which privity is absent. *See* Restatement (Second) of Torts § 552 cmt. g (1977) ("The person for whose guidance the information is supplied is often the person who has employed the supplier to furnish it . . . .").

Plaintiffs' allegations are sufficient to satisfy the elements of section 552.  Plaintiffs have alleged that ETS, in the course of its business as the administrator of the PLT: 7-12 test (AMC ¶ 13), negligently misrepresented their scores to them

33

and negligently misrepresented that they had failed the exam (AMC ¶¶ 84-85), that ETS knew and intended that plaintiffs would rely on that information in planning their careers and seeking certification as teachers (AMC ¶ 93), that plaintiffs justifiably relied on ETS's misrepresentations (AMC ¶¶ 94-95), and that plaintiffs suffered pecuniary harm as a result.  (AMC ¶¶ 32-36, 96).  Thus, plaintiffs' allegations are sufficient to state a negligent misrepresentation claim under the laws of Pennsylvania.

> b.  *Ohio*

Although Ohio law on negligent misrepresentation is less straightforward than that of Pennsylvania, the result is the same.  The Ohio Supreme Court has held on multiple occasions that claims for negligent misrepresentation under Ohio law are governed by section 552 of the Restatement (Second) of Torts. *See Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (applying section 552); *Gutter v. Dow Jones, Inc.*, 490 N.E.2d 898, 900-01 (Ohio 1986) (same); *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212, 214-15 (Ohio 1982).

More recently, however, the Ohio Supreme Court declined to apply section 552 when it held that a subcontractor could not state a claim for negligent misrepresentation against an architect with whom the subcontractor did not have a contract.

*Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp.*, 560 N.E.2d 206, 211 (Ohio 1990).  In *dicta*, the court stated that "[t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement."  *Id.* (quoting *Sensenbrenner v. Rust, Orling, & Neale*, 374 S.E.2d 55, 58 (Va. 1988)).  The court continued that "applying the Restatement in this context will encompass liability that is otherwise best suited for contract negotiation and assignment."  *Id.* at 212.

This language could be interpreted as a statement that Ohio courts will not permit a separate claim for negligent misrepresentation when either party could challenge the misrepresentation under a contract between them.  *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (no claim for negligent misrepresentation when duty to provide information was "purely contractual").  The Court does not, however, interpret Ohio law as barring such a claim simply because a contractual relationship exists between the plaintiff and the defendant.  First, there was no contractual relationship between the parties in *Floor Craft*, so any implication in that case that Ohio law prohibits negligent misrepresentation claims by parties in privity is *dicta*.  Second, *Floor Craft* barred negligent misrepresentation claims between

35

parties who were *not* in a contractual relationship.  The thrust
of *Floor Craft* was that tort claims for negligent
misrepresentation lie in the class of cases falling between those
in which there is no relationship between the parties that can
form the basis of a duty to provide correct information, and
those in which the parties' contractual relationship indicates
that any injuries suffered were in contemplation at the time of
the contract.  Indeed, later decisions of Ohio state appellate
courts have not construed *Floor Craft* as a flat prohibition on
negligent misrepresentation claims involving privity of contract.
*See Univ. Contracting Corp. v. Aug*, No. C-030719, A-0103486, 2004
WL 3015325, at *5 (Ohio Ct. App. Dec. 30, 2004) ("No Ohio court
has denied the right of a party in privity to bring negligent-
misrepresentation claims."); *McCarthy, Lebit, Crystal & Haiman
Co.*, 622 N.E.2d 1093, 1105-07 (Ohio Ct. App. 1993) (permitting
negligent misrepresentation claim between contracting parties).
It is true that the case law recognizes a limitation in Ohio law
that bars claims for negligent misrepresentation in bargained-
for, arms-length business transactions between sophisticated
parties.  *See Univ. Contracting Corp.*, 2004 WL 3015325, at *5
("Ohio courts have limited the ability to bring a negligent-
misrepresentation tort claim where a contract exists between
business entities.").  But the explanation for this limitation is

36

that "[w]here the parties are sophisticated business entities that have contracted to protect against potential economic loss, contract principles override the tort principles embodied in Section 552. . . .  To conclude otherwise would unduly impair the parties' ability to allocate risks and duties by contract." *Id.* (citing *Berschauer/Phillips Construction Co. v. Seattle School Dist. No. 1*, 124 Wash.2d 816, 828 (1994)).

In this case, although the relationship between plaintiffs and ETS is governed by contract, that contract was not a freely bargained-for contract between sophisticated entities.  Thus, the concerns expressed by the Ohio courts – that tort law will subsume contract law – are not present here.  Plaintiffs did not negotiate with ETS to allocate the risks associated with ETS's misrepresenting their scores on the PLT: 7-12.  Accordingly, permitting plaintiffs to proceed under section 552 would not intrude on the parties' ability to contract freely.  Thus, the Court holds that the master complaint states a claim for negligent misrepresentation under Ohio law.

### C.   Emotional Distress Damages - Tort Claims

#### 1.   Applicable Law

The parties agree that the law applied for determining whether plaintiffs could maintain negligence and negligent

misrepresentation claims also applies to determine whether plaintiffs can recover emotional distress damages in tort on their claim for negligent misrepresentation.  (*See* ETS COL Mem. at 11; Pl. COL Mem. at 12).  Accordingly, the Court will apply the laws of the plaintiffs' states of residence to determine the availability of emotional distress damages for their negligent misrepresentation claims.

   2.   *Analysis*[5]

   a.   *Pennsylvania - The Restatement (Second) of Torts §
        552*

     Section 552 of the Restatement (Second) of Torts permits plaintiffs to recover "pecuniary loss caused to them by their justifiable reliance upon" a defendant's negligent misrepresentations.  Restatement (Second) of Torts § 552 (1977). By its terms, section 552 would therefore appear to bar the recovery of emotional distress damages in actions for negligent misrepresentation.  This is confirmed by section 552B, which

---

     [5]In its motion to dismiss, ETS challenges plaintiffs' right to recover emotional distress damages for *negligence* under Pennsylvania law.  (*See* ETS Reply Mem. at 11 n.16).  The Court has, however, dismissed plaintiffs' claims for negligence and has permitted plaintiffs to proceed in tort only on claims for negligent misrepresentation.  The parties have not addressed the availability of emotional distress damages for negligent misrepresentation claims.  Nonetheless, the Court will address this issue under the laws of Ohio and Pennsylvania.

provides the measure of damages for negligent misrepresentation claims.  Section 552B limits a plaintiff's recovery to the difference between the value he received in the transaction and the value he gave in return and any other pecuniary loss suffered as a result of his reliance upon the defendant's misrepresentation.  *Id.* § 552B.

Although the courts of Pennsylvania have not expressly addressed whether section 552 bars recovery of damages for emotional distress, courts in other jurisdictions that have adopted section 552 have routinely held that it does.  *See, e.g., Repucci v. Lake Champagne Campground, Inc.*, 251 F. Supp. 2d 1235, 1240 n.3 (D. Vt. 2002) (request for emotional distress "clearly not compensable" under section 552); *Bass v. Hendrix*, 931 F. Supp. 523, 538 (S.D. Tex. 1996) (emotional distress damages barred under section 552B); *but see Little v. York City Earned Income Tax Bureau*, 481 A.2d 1194, 1200-01 (Pa. Super. 1984) (upholding an award for humiliation and mental anguish in a negligent misrepresentation case in which the plaintiff did not assert any physical contact or injury).  As the Pennsylvania courts, including the Pennsylvania Supreme Court in *Bilt-Rite Contractors*, 866 A.2d at 285, have expressly adopted section 552 to govern claims for negligent misrepresentation, the Court predicts that Pennsylvania would likewise deny plaintiffs'

39

recovery of damages for emotional distress.

        *d.   Ohio*

     The Ohio Supreme Court has never expressly adopted section 552B to determine the remedies available for negligent misrepresentation.  At least one lower court in Ohio has, however, applied section 552B, *see McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt.*, 622 N.E.2d 1093, 631-34 (Ohio Ct. App. 1993), and as the Ohio Supreme Court has applied section 552 on numerous occasions, the Court predicts that it would likewise follow section 552 and limit plaintiffs' recovery for negligent misrepresentation to pecuniary losses.  The Ohio plaintiffs cannot, therefore, recover for emotional distress in tort.

       **D.   Emotional Distress Damages - Contract**

        *1.   Applicable Law*

        *a.   Ohio – The Restatement (Second) of Conflict of Laws § 188*

     Ohio courts have adopted section 188 of the Restatement (Second) of Conflict of Laws as their choice-of-law rule in contracts cases.  *See, e.g., Bobb Chevrolet, Inc. v. Jack's Used Cars, L.L.C.*, 772 N.E.2d 171, 174 & n.5 (Ohio Ct. App. 2002)

(citing *Gries Sports Enters., Inc. v. Modell*, 473 N.E.2d 807
(Ohio 1984)).  Section 188 provides that the rights and duties
with respect to contract issues are to be determined under the
principles stated in section 6.  Restatement (Second) of Conflict
of Laws § 188 (1971).  Section 188 also states that courts should
consider the following additional factors, according to their
relative importance to the particular issue: (a) the place of
contracting; (b) the place of negotiation; (c) the place of
performance; (d) the location of the subject matter of the
contract; and (e) the domicile, residence, place of incorporation
and place of business of the parties.  *Id.*

As in the tort context, the application of the principles
set forth in section 6 points to the law of the state of
residence of the Ohio plaintiffs.  *See supra*.  That conclusion is
not altered by consideration of the additional factors from
section 188.[6]  The parties agree that the place of contracting is
the state of each plaintiff's residence.  The only factor on
which there is any disagreement between the parties is the place
of performance.  ETS asserts that, although a portion of the

---

[6]Factors (b) and (d) are not particularly relevant in this
case, as the contracts at issue were not negotiated and did not
involve a tangible subject matter with a fixed location.
Moreover, the parties' places of residence have already been
weighed in connection with the principles of section 6, so factor
(e) is similarly not relevant here.

41

performance took place in New Jersey, the more significant
portion of the performance – the administration of the exam and
the plaintiffs' receipt of their scores – took place in the
individual plaintiffs' states of residence.  Plaintiffs, on the
other, hand, argue that the place of performance may be New
Jersey.  The Court finds that the parties' contract was performed
in both New Jersey and Ohio, and that this factor does not point
strongly toward the law of any state.  As the Ohio plaintiffs and
ETS ultimately agree, however, the overall import of the factors
in section 188 leads to the conclusion that the issue of
emotional distress damages for breach of contract is governed by
the laws of Ohio.

       *c.   Pennsylvania*

     Just as the application of Pennsylvania's hybrid choice-of-
law approach led to the application of the law of the state of
Martin's residence for tort claims, *see supra*, that analysis
should also point to the law of the state of residence as to the
issue of whether Martin can recover mental anguish damages for
breach of contract.  *See In re Estate of Agostini*, 457 A.2d 861,
871 (Pa. Super. 1983)("Pennsylvania has not restricted the
application of this flexible choice-of-law solely to conflict
questions involving torts.") (collecting cases).  The Court

perceives no discernable difference in the relative governmental interests of Pennsylvania and New Jersey as applied to the contract issues, and the Court will apply the law of Martin's state of residence, Pennsylvania, to her claim for emotional distress damages for breach of contract.

> 2.   *Analysis*
>
> a.   *Ohio and Pennsylvania – The Restatement (Second) of Contracts § 353*

Courts in Ohio have adopted section 353 of the Restatement (Second) of Contracts to determine the availability of emotional distress damages for breach of contract.  *See Kishmarton v. William Bailey Constr., Inc.*, 754 N.E.2d 785, 788 (Ohio 2001). Emotional distress damages are available under section 353 for a breach of contract only if "the breach also cause bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts § 353 (1981).  Plaintiffs do not allege bodily contact or harm.  In *Kishmarton*, the Ohio Supreme Court held that recovery for emotional disturbance was theoretically available in a claim for breach of the implied duty to construct a house in a workmanlike manner, but found that there was insufficient evidence to justify an award of emotional

43

disturbance damages.  *Kishmarton*, 754 N.E.2d at 788.  In

determining that plaintiffs were entitled to pursue their claim

for emotional distress damages, the *Kishmarton* court held that

the Ohio Constitution guaranteed plaintiffs such a right:

"[t]hough proof of emotional distress damages in these cases will

be difficult, we are convinced that wronged parties are

constitutionally entitled to an opportunity to recover for

emotional distress damages."  *Id.*  Pennsylvania courts would also

likely apply the approach of section 353 of the Restatement

(Second) of Contracts, *see Novick v. Unumprovident Corp.*, No.

Civ. A. 01-CV-258, 2001 WL 793277, at *1 (E.D. Pa. July 10, 2001)

(applying section 353 in striking emotional distress damages for

a breach of insurance contract claim); *Rodgers v. Nationwide Mut.*

*Ins. Co.*, 496 A.2d 811, 815 (Pa. Super. 1985) (applying section

353 as a bar to emotional distress damages when an automobile

insurance provider failed to defend an insured against suit,

resulting in a default judgment and personal bankruptcy).

Section 353 lists examples of situations in which

contractual breaches might be expected to lead to serious

emotional disturbance: "contracts of carriers and innkeepers with

passengers and guests, contracts for the carriage or proper

disposition of dead bodies, and contracts for the delivery of

messages concerning death."  Restatement (Second) of Contracts §

44

353 cmt. a; *see also Stockdale v. Baba*, 153 Ohio App.3d 712, 733-34 & 736 (2003) (upholding emotional distress damages for breach of a settlement agreement between a stalker and one of his victims, reached in connection with the stalker's criminal prosecution).  But other contractual breaches, "resulting for example in sudden impoverishment or bankruptcy, may by chance cause even more severe emotional disturbance, but, if the contract is not one where this was a particularly likely risk, there is no recovery for such disturbance."  *Id.*  For example, the *Novick* court held that the alleged failure of the defendant to provide disability benefits for its insured, which resulted in emotional distress, would not subject the provider to liability for emotional distress damages because a disability insurance contract did not fall within the type of contract the breach of which was likely to cause emotional distress.  *Novick*, 2001 WL 793277 at *1.  Further, in evaluating the issue under Ohio law and the Restatement, a federal court in Ohio noted that contracts for which emotional distress damages are available "are extremely rare, pertaining to 'contracts which inherently involve highly charged emotional situations, such as marriages or deaths.'" Nitzsche v. Stein, Inc., 797 F.Supp. 595, 600 (N.D. Ohio 1992) (citing *Int'l Union of Automobile Workers v. Park-Ohio Industries*, 687 F.Supp. 338, 343 (N.D. Ohio 1987), *aff'd in part,*

*rev'd in part* 876 F.2d 894 (table)).   In *Nitzsche*, the court
dismissed a claim for emotional distress damages for the alleged
breach of a collective bargaining agreement by wrongful
termination and manipulation of the union's grievance process.
*Id.* at 600-01.

    The question of whether a contract or breach is particularly
likely to result in serious emotional disturbance is one of law,
for the Court to decide.   *See, e.g., Stockdale*, 153 Ohio App.3d
at 718 & 734; *Gallagher v. Upper Darby Township*, 114 Pa.Cmwlth.
463, 472 (1988).   The examples of contracts and breaches likely
to result in serious emotional distress illustrate that such
contracts or the situation surrounding their breach must be
extremely sensitive.   In each of the examples, the pecuniary harm
suffered by the plaintiffs is likely to be minor, while the
emotional disturbance is likely to be great.   Although emotional
distress may have resulted from ETS's improper score reporting, a
contract to provide and score standardized tests is not as
sensitive as a contract for funeral services, for example, in
which the interests implicated are of the most personal and
emotional sort.   Further, claims for emotional distress damages
involving alleged breaches of disability insurance and employment
contracts, which implicate similar pecuniary and emotional
interests to those at issue in this case, have been dismissed by

courts in Pennsylvania and Ohio.  *See supra*.  Accordingly, the
Court grants ETS's motion to dismiss plaintiffs' claims for
emotional distress damages for breach of contract under Ohio and
Pennsylvania law.


    **E.    Punitive Damages - Tort**

       1.   *Applicable Law*

       a.   *Ohio - The Restatement (Second) of Conflict of*
            *Laws § 145.*

The availability of punitive damages in tort under the
Restatement (Second) of Conflict of Laws is governed by the law
of the state selected by application of the factors in section
145, the general rule for tort claims.  *See* Restatement (Second)
of Conflict of Laws § 171 cmt. d (1971) ("The law selected by
application of the rule of § 145 determines the right to
exemplary damages.").  ETS asserts that, as with the other tort
issues in this action, section 145 points to the law of the
plaintiffs' states of residence.  Plaintiffs argue that New
Jersey law applies to the issue of punitive damages.

Section 145 applies differently to the issue of whether
plaintiffs can recover punitive damages in tort than it did to
the other tort questions in this case.  Punitive damages, as a
general matter, are intended to fulfill different policy

47

objectives than other tort rights and remedies.  Punitive damages are typically permitted in order to punish and deter wrongful conduct, rather than to compensate victims for their losses. *See, e.g., Digital & Analog Design Corp. v. N. Supply Co.*, 63 Ohio St.3d 657, 660 (1992), overruled on other grounds by *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552 (1994).  Accordingly, in the case of punitive damages, the contacts of the state in which the allegedly wrongful conduct occurred and the state of the defendant's place of business take on a more prominent role.  *See* Restatement (Second) of Conflict of Laws § 145 cmt. c (1971) ("If the primary purpose of the tort rule involved is to deter or punish misconduct . . . the state where the conduct took place may be the state of the dominant interest and thus that of the most significant relationship.).  Here, New Jersey, ETS's principal place of business, is the state in which the allegedly wrongful conduct took place – where ETS scored the PLT: 7-12 and made its representations about plaintiffs' scores – and the Court concludes that New Jersey has the most significant connection to the issue of punitive damages in tort under the law of Ohio.

   *b. Pennsylvania*

  Pennsylvania's choice-of-law rules lead to the same result. Both Pennsylvania and New Jersey have an interest in seeing their

laws applied, but, because of the nature of the punitive damages
remedy and the policies underlying that remedy, New Jersey has a
stronger interest than Pennsylvania with respect to this issue,
and the Court will apply New Jersey law.  *See Kelly v. Ford Motor
Co.*, 933 F. Supp. 465, 469-71 (E.D. Pa. 1996) (applying law of
defendant's place of business to punitive damages claims).

### 2.    *Analysis*

#### a.    *New Jersey*

Under New Jersey law, punitive damages are available only if
the plaintiff proves by clear and convincing evidence that the
defendant acted with "actual malice or . . . wanton and willful
disregard of persons who foreseeably might be harmed."  N.J.
Stat. Ann § 2A:15-5.12.  The statute also provides that the
plaintiff's burden of proof cannot be satisfied "by proof of any
degree of negligence including gross negligence."  *Id.*  New
Jersey courts have held that a claim for punitive damages
requires "circumstances of aggravation and outrage, beyond the
simple commission of a tort."  *Pavlova v. Mint Mgmt. Corp.*, 868
A.2d 322, 326 (N.J. Super. 2005).

Plaintiffs cannot proceed with a claim for punitive damages
under New Jersey law.  Although plaintiffs allege that ETS was
negligent in scoring the PLT: 7-12, they do not allege any

49

conduct by ETS that, if proven, could support an award of punitive damages under New Jersey's demanding standard.  The *Pavlova* court dismissed the plaintiff's claim for punitive damages in connection with a fire at a housing complex for the elderly, citing the absence of "blatantly egregious, deliberate conduct that was practically certain to cause both imminent and serious harm." *Pavlova*, 868 A.2d at 328.  The court in *Grand Street Artists v. Gen. Elec. Co.*, No. Civ. 96-CV-3774, 1997 WL 33475074, at *5 (D.N.J. Feb. 11, 1997), similarly dismissed punitive damages claims that were based on "conclusory allegations of unspecified malicious acts and omissions." *Id.* The court explained that such generalized assertions cannot sustain a claim for punitive damages. *Id.*  In the present case, the plaintiffs allege that ETS's actions were "grossly and flagrantly negligent, reckless and malicious," (AMC ¶ 79), but they do not cite specific instances of behavior "that evidence an utter disregard for others." *Pavlova*, 868 A.2d at 329.  On the contrary, the allegations of malicious or outrageous behavior are of the same level of generality as those that were dismissed in *Grand Street Artists*.  Accordingly, plaintiffs' claim for punitive damages in tort must be dismissed.

**F.   Punitive Damages - Contract**

50

Because the choice of law rules are less clear for contracts, and because the result is the same under each of the relevant states' laws, the Court will analyze the availability of punitive damages for breach of contract under the laws of Ohio, Pennsylvania, and New Jersey, which are the only states the laws of which arguably could apply.

Under Ohio law, punitive damages are not available for breach of contract. *See Digital & Analog Design Corp.*, 44 Ohio St.3d at 46 (citation omitted). This is true "[n]o matter how willful the breach." *Id.* Thus, a claim for breach of contract does not provide a basis for an award of punitive damages. *Id.* Under Pennsylvania law, punitive damages are similarly not available for breach of contract. *DiGregorio v. Keystone Health Plan E.*, 840 A.2d 361, 370 (Pa. Super. Ct. 2003); *Johnson v. Hyundai Motor America*, 698 A.2d 631, 639 (Pa. Super. Ct. 1997).

Finally, under New Jersey law, "[w]ith rare exception, punitive damages are not available in an action for a breach of contract . . . and have been restricted to tort actions." *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 369-70 (1988) (citations omitted). As the Court discussed in the tort context, *supra*, this is not the type of case that implicates "rare" exceptions. Indeed, in a case involving the Praxis scoring error, a New Jersey court held that "the usual rule is

51

that punitive damages . . . are not recoverable on a basic breach of contract claim." *Arnold v. ETS*, No. Mer-L-2856-04, Mot. Tr. at p. 31 (N.J. Super. Ct. March 18, 2005).  The court then dismissed the plaintiff's claim for punitive damages.  *Id.*  The plaintiffs' allegations of wanton or malicious conduct are insufficient to sustain an award of punitive damages. Accordingly, the plaintiffs are not entitled to punitive damages.


**VI.   CONCLUSION**

    For the foregoing reasons, defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.


    New Orleans, Louisiana, this <u>25th</u> day of May, 2007.


                    SARAH S. VANCE
              UNITED STATES DISTRICT JUDGE


52